**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

United States Courts
Southern District of Texas
FILED

FEB - 1 2005

Michael N. Milby, Clerk of Court

|  |  |  |
|---|---|---|
| JOSE HERNANDEZ, AS NEXT FRIEND OF | ) | |
| AN INCAPACITATED ADULT, IRMA | ) | |
| HERNANDEZ, | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| vs. | ) | CIVIL ACTION NO. C-04-319 |
|  | ) | |
| FORD MOTOR COMPANY | ) | |
|  | ) | |
| Defendant. | ) | |

## DEFENDANT FORD'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT ALLAN KAM

Defendant Ford Motor Company ("Ford") submits this *Daubert* motion to exclude the proposed testimony of Allan Kam, an expert retained by Plaintiff to testify regarding the "nature" of Federal Motor Vehicle Safety Standards (FMVSSs), the "rulemaking history" of FMVSS 216 (which governs vehicle roof strength), and the history of the rulemaking of the National Highway Traffic Safety Administration (NHTSA) regarding vehicle rollover resistance, which never resulted in a FMVSS.

Mr. Kam is a lawyer who worked at NHTSA for essentially his entire career. As will be seen, the principal purpose of his purported "expert" testimony is to give what amounts to a closing argument excoriating Ford and the automotive industry for allegedly misleading and corrupting NHTSA into (1) adopting and then failing to update a wholly inadequate roof strength standard and (2) failing to adopt any rollover resistance standard at all. A second purpose of his proposed testimony is to provide a vehicle for Plaintiff to present inadmissible hearsay to the jury that is largely irrelevant and is prejudicial to Ford and the automotive industry in general. A third purpose of his proposed testimony is to

usurp the role of this Court in instructing the jury regarding the federal laws underpinning the FMVSSs.

Mr. Kam is completely unqualified to express an "expert" opinion on any issue of consequence to this action. He admits that he is not an expert in accident reconstruction, engineering, physics, statistics, motor vehicle design in general, and motor vehicle stability and handling in particular.

In addition, his opinions lack the foundation required by *Daubert* and Rule 702. In fact, his experience at NHTSA cannot logically form the foundation for any of his purported "expert" opinions, because a federal regulation (called "Part 9") prohibits him from testifying regarding any rulemaking or investigation in which he participated while at NHTSA. Therefore, even if Mr. Kam had relevant experience while at NHTSA, he couldn't testify about it. The fact that he claims that Part 9 permits his testimony proves that he did not obtain any experience at NHTSA relevant to the central issues on which Plaintiff wants him to testify -- roof strength and rollover stability.

For these reasons, Mr. Kam's testimony is inadmissible under Rule 702 and *Daubert*, and in some instances under Rule 403 as well. Therefore, Mr. Kam's testimony should be excluded in its entirety.

## LEGAL ARGUMENT

### I.    MR. KAM'S PROPOSED TESTIMONY.

Mr. Kam proposes to testify in three broad areas:

- The "nature of Federal motor vehicle safety standards (FMVSSs) in general";
- The "rulemaking history of [FMVSS] 216, *Roof Crush Resistance*"; and
- The "history of [NHTSA's] rulemaking activities that considered a rollover prevention FMVSS."

[Report of A. Kam, *attached as* Exhibit A, at 1.] In connection with the latter two areas,

Mr. Kam was also "asked to note participation by Ford Motor Company . . . and trade associations to which Ford belonged." [*Id.*]

Regarding the "nature" of FMVSSs, Mr. Kam expresses the following general opinions:

- They are "minimum" standards. [*Id.*, at 6-9.]
- Compliance with FMVSSs does not mean that a vehicle is not defective. [*Id.*, at 12-13.]
- Enforcement of compliance with FMVSSs, and defect investigations, are subject to certain limitations periods. [*Id.*, at 6-7.]
- Certain procedures are followed in adopting them. [*Id.*, at 4-6.]
- Certain NHTSA administrators have urged auto manufacturers to exceed the standards. [*Id.*, at 8-9.]
- Many FMVSSs are "lenient." [*Id.*, at 10.]
- NHTSA has been in a "deregulatory environment" for much of its history. [*Id.*, at 11.]
- NHTSA's Office of Vehicle Safety Compliance has limited resources. [*Id.*, at 12.]

Regarding FMVSS 216, Mr. Kam proposes to testify regarding seven specific "criticisms" of the standard. [*Id.*, at 15.]

In addition, at various points in his discussion of all three of his major subjects, Mr. Kam inserts discussions of allegedly "bad acts" on Ford's part -- acts about which he has no personal knowledge and which were not related to any projects on which he worked while at NHTSA. For example:

- Allegedly improper influence of Ford and General Motors in meetings with President Nixon and, among others, John Erlichman (of Watergate fame), in 1971. These meetings were apparently recorded on some of the secret tapes that came to light during the Watergate investigation. [*Id.*, at 19-23.]
- The "Ford-Firestone controversy" or "debacle" involving tire tread separations, in mid-2000. [*Id.*, at 10, 39.]
- Alleged industry influence over Senator Richard Shelby, which Kam claims led to attempted delay in the implementation of a rollover resistance rating system. [*Id.*, at 39.]

- Documents that Ford's allegedly "improperly withheld" in a NHTSA investigation regarding the Ford Bronco II. [*Id.*, at 34.]

Finally, regarding these and other issues, Mr. Kam's report indicates an intention to use his testimony as an avenue for admitting a wide variety of hearsay into the record, such as the Nixon tapes mentioned above and statements and letters by a variety of NHTSA personnel. [*Id.*, at 19-23.]

## II.   MR. KAM'S OPINIONS ARE INADMISSIBLE UNDER RULES 702 AND 403 OF THE FEDERAL RULES OF EVIDENCE.

Ford challenges Mr. Kam's testimony on *Daubert* grounds, including qualification, foundation of his opinions, and *Daubert's* "fit" requirement, which incorporates the relevance balancing analysis of Fed. R. Evid. 403. As the proponent of Mr. Kam's testimony, the Plaintiff bears the burden of proving its admissibility under *Daubert* and Rule 702. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

### A.   Rule 702 Requires An Expert To Be Qualified.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The Supreme Court has held that once an objection to an expert's testimony is raised, then the trial court must perform its *Daubert* gatekeeper duties. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) ("where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'") (quoting *Daubert*, 509 U.S. at 592). In fact, although a trial court has discretion in the manner in which the gatekeeper review is conducted, it has no discretion regarding the fulfillment of its gatekeeper obligation, which must be performed before the jury is permitted to hear the evidence. *See Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002), *amended en banc* at 319 F.3d 1073 (9th Cir. 2003); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087

(10th Cir. 2000). Further, the trial court is required to make specific findings on the record that it performed its gatekeeper obligations and found the testimony admissible under *Daubert*. *Goebel*, 215 F.3d at 1088-89.

A trial court fulfills its gatekeeper obligation by undertaking two separate inquires. First, the court must determine whether the witness is qualified to offer the opinions he or she is espousing. Fed. R. Evid. 702. Second, the proponent of the witness bears the burden of proving that its witness' opinions are both relevant and reliable. *See Kuhmo Tire*, 526 U.S. at 141, 152; *Daubert*, 509 U.S. at 589-90.

Mr. Kam is not qualified in any relevant field. He is not an engineer, scientist or mathematician. [Deposition of A. Kam, *attached as* Exhibit B, at 16-17.] He cannot remember taking any college-level course on engineering, math, or science, other than social sciences and one course in botany. [*Id.*, at 17-18.] He admits that he is not an expert in accident reconstruction; engineering; physics; motor vehicle design; motor vehicle dynamics, handling or stability; statistics in general; motor vehicle accident statistics in particular; biomechanics, or occupant kinematics. [*Id.*, at 25-27.]

While at NHTSA, Mr. Kam never worked on any rulemaking regarding FMVSS 216. [*Id.*, at 32.] Other than in the context of an "Enforceability Task Force," Mr. Kam never worked on any projects involving changes or proposed changes to FMVSS 216 while he was at NHTSA. [*Id.*, at 74.] Part 9 prohibits him from testifying about his work on the "Enforceability Task Force." [*Id.*, at 73-74.] He worked on certain enforcement actions involving FMVSS 216, but is prohibited from testifying about those actions by the Part 9 regulation, and in any event does not remember those enforcement actions. [*Id.*, at 72-73.] Mr. Kam agreed that his work on the "Enforceability Task Force" and on certain FMVSS 216 enforcement actions do not form the basis of his expert opinions in this case. [*Id.*] In short, nothing that Mr. Kam did at NHTSA qualifies him to discuss the "rulemaking history" of FMVSS 216.

While at NHTSA, Mr. Kam never worked on any rulemaking regarding either a

5

rollover stability standard or a rollover stability consumer information program. [*Id.*, at 32.] Mr. Kam worked on certain rollover stability defect investigations at NHTSA, but was not asked to discuss them in this case, so they are outside the scope of his proposed testimony. [*Id.*, at 226.] Mr. Kam did not work on the Bronco II defect investigation. [*Id.*, at 256.] Further, the Part 9 regulation would prohibit Mr. Kam from testifying about any rollover stability defect investigations on which he worked. [*Id.*, at 31-32.] Nothing about Mr. Kam's work a NHTSA qualifies him to discuss the "history of rulemaking activities" regarding a possible FMVSS on rollover resistance that was never adopted.

He likewise lacks any qualifications for discussing the seven "criticisms" of FMVSS 216 listed in his report (on p. 15).

### B.    Mr. Kam's Testimony Lacks The Foundation Required By *Daubert.*

As noted above, before expert testimony may be admitted, "the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592). Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert*, the United States Supreme Court required the district courts to act as "gatekeepers" to exclude unscientific, unreliable testimony from purported "experts." In *Kumho Tire*, the Court made clear that this requirement applies to all "expert" testimony, scientific or otherwise. Mr. Kam's testimony does not fit neatly into the traditional analysis of *Daubert* factors. The overarching rule, however, is that the Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at

152,

The federal "Part 9" regulation bears strongly on the lack of foundation for Mr. Kam's opinions. Part 9 appears at 49 CFR, Ch. 9, and provides in pertinent part:

> (b)    If authorized to testify pursuant to these rules, an employee may testify only as to facts within that employee's personal knowledge with regard to matters arising out of his or her official duties.
>
> . . .
>
> (2)    The employee shall not testify as to facts that are contained in a report, or any part of a report, unless the employee has obtained permission from agency counsel to disclose this information.
>
> (3)    The employee shall not disclose confidential or privileged information unless the employee has obtained permission from agency counsel to disclose the information.
>
> . . .
>
> (c)    An employee shall not testify as an expert or opinion witness with regard to any matter arising out of the employee's official duties or the functions of the Department.  An employee who is asked for questions that call for expert or opinion testimony shall decline to answer on the grounds that it is forbidden by this part.  Agency counsel shall advice the employee on how to proceed if the presiding officer directs the employee to provide expert or opinion testimony.

[49 CFR Ch. 9, *attached as* Exhibit C, at § 9.11.]

The definition of "employee" includes a former NHTSA employee like Mr. Kam. [Id., at § 9.3.]  Mr. Kam acknowledges that Part 9 applies to his testimony, and agrees that the principal purpose of Part 9, as applied to former employees, is to protect the confidentiality of the deliberative process involved in NHTSA's rulemakings and its enforcement actions.  [Kam Depo., Ex. B, at 28-29.]  As applied to Mr. Kam, Part 9 prohibits him from testifying regarding matters on which he personally participated, prohibits him from purporting to speak for the agency, and prohibits him from disclosing any sensitive, confidential information, unless he obtains specific authorization.  Mr. Kam has not sought permission from NHTSA to testify in this particular case, and does not believe that such permission is necessary.  [*Id.*, at 29-31.]

In order to protect the deliberative processes of the agency, Part 9 would prohibit testimony like Mr. Kam's by any current or former NHTSA employee who had actually worked on the matters in question. The heart of Mr. Kam's testimony discusses such deliberative processes with respect to roof strength and rollover stability issues, but he seems to believe that he can avoid the prohibition of Part 9 because he didn't work on the matter. That may be so, but if he didn't work on these matters while at NHTSA, he <u>has no foundation</u> for his purported "expert" opinions. Indeed, he admitted as much in a deposition, early in his career as an expert witness:

> Q:    Okay, but to the extent, and this is purely a hypothetical, to the extent that you're aware of the deliberative processes that were undertaken but you did not participate, then it's your understanding as an expert on Part 9 that would you be able to testify about those issues without advanced permission from the agency?
>
> A:    On a matter that I actually worked on?
>
> Q:    On a matter that you did not actually work on.
>
> A:    Well, if it was a matter that I didn't work on, how would I know what deliberations were undertaken. I wouldn't have knowledge of them.

[Deposition of A. Kam in *Garza v. Colburn, attached as* Exhibit D, at 19-20.]

For these reasons, Mr. Kam has no foundation for his purported "expert" opinions regarding the history of NHTSA rulemaking regarding FMVSS 216 and rollover resistance. Likewise, he has no foundation for his opinion that FMVSSs are "lenient," or regarding the list of seven criticisms of FMVSS 216.

### C.    ***Daubert* And Rule 403 Requires An Expert's Opinion To Be Relevant.**

The *Daubert* analysis also incorporates the relevance balancing requirement of Fed. R. Evid. 403. "Expert testimony that does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (internal quotations omitted). The *Daubert* court referred to this as the "fit" requirement, and went on to explain that:

> Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present

rules exercises more control over experts than over lay witnesses.

*Id.* at 595.

Mr. Kam proposes to testify regarding a variety of subjects of little or no relevance to the present action, most of which are highly prejudicial to Ford, would constitute a waste of time, and would mislead or confuse the jury, as follows:

- That enforcement of compliance with FMVSSs, and defect investigations, are subject to certain limitations periods. [Kam Report, Ex. A, at 6-7.]

  This issue is wholly irrelevant. Plaintiff does not contend that the subject Explorer failed to comply with any relevant FMVSS, and there is no evidence that a defect investigation was ever contemplated with respect to the Explorer -- except in connection with the failure of certain Firestone tires, and that investigation was closed. This issue would also mislead and confuse the jury into thinking that there was some issue of defect investigation or FMVSS compliance relating to the Explorer that was not pursued because of a limitations issue.

- Certain NHTSA administrators have urged auto manufacturers to exceed the standards. [*Id.*, at 8-9.]

  These comments are wholly irrelevant and would mislead and confuse the jury regarding the plain requirements of FMVSS and the effect of such compliance under Texas statute.

- NHTSA's Office of Vehicle Safety Compliance has limited resources. [*Id.*, at 12-13.]

  This testimony is irrelevant, as Plaintiffs do not contend that the Explorer failed to comply with any relevant FMVSS, and it would mislead and confuse the jury into thinking that there was some issue of FMVSS compliance relating to the Explorer

- The requirements of the TREAD Act of November 2000 regarding rulemaking on rollover resistance. [*Id.*, at 7, 10, 40-41.]

  This testimony is irrelevant as the TREAD Act was passed over four years after the manufacture of the Explorer at issue, a 1996.

- Discussion of what Mr. Kam refers to as the "Ford-Firestone controversy" and "debacle." [*Id.*, at 10, 39.]

- Allegedly improper influence of Ford and General Motors in meetings with President Nixon and, among others, John Erlichman (of Watergate fame), in 1971. These meetings were apparently recorded on some of the secret tapes that came to light during the Watergate investigation. [*Id.* at 19-23.]

- Alleged industry influence over Senator Richard Shelby, which Kam claims led to attempted delay in the implementation of a rollover resistance rating system. [*Id.*, at 39.]

- Documents that Ford's allegedly "improperly withheld" in a NHTSA investigation regarding the Ford Bronco II. [*Id.*, at 34.]

### D. Mr. Kam's Proposed Testimony Regarding The "Nature" Of FMVSSs Is Inadmissible Because The Testimony Of A Lawyer As An "Expert" Is Disfavored And Presents Special Dangers Of Irrelevance And Prejudice.

As discussed in greater detail below, most of Mr. Kam's proposed testimony regarding the "nature" of FMVSSs, and procedures for their adoption, is merely a recitation of federal law. The federal courts have repeatedly recognized the special problems associated with lawyers, like Mr. Kam, who purport to testify as "expert" witnesses.

While Fed. R. Evid. 704 permits an expert witness to offer an opinion on an "ultimate issue," is it settled that "[i]t is not for witnesses to instruct the jury as to the applicable principles of law, but for the judge." *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2nd Cir. 1977); *see also Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988); *Willette v. Finn*, 778 F. Supp. 10, 11 (E.D. La. 1991); *Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 79 F. Supp. 2d 252, 256 (W.D.N.Y. 2000).

> [E]xpert testimony on law is excluded because "the tribunal does not need the witness' judgment. . . . The *judge* (or the jury as instructed by the judge) can determine equally well. . . ." The special legal knowledge of the judge makes the witness' testimony superfluous.

*Marx & Co.*, 550 F.2d at 510 (emphasis in original).

"[Q]uestions which would merely allow the witness to tell the jury what result to reach are not permitted. Nor is the rule [704] intended to allow a witness to give *legal* conclusions. . . . [A]llowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). The danger of a witness invading the province of the judge and jury, by testifying as to the content of the law or to legal conclusions, is especially high where the witness -- like Mr. Kam -- is a lawyer who brings no other relevant expertise to the discussion.

There is a significant difference between an attorney who states his

belief of what law should govern the case and any other expert witness. While other experts may aid a jury by rendering opinions on ultimate issues, our system reserves to the trial judge the role of adjudicating the law for the benefit of the jury. When an attorney is allowed to usurp that role, harm is manifest in at least two ways.

First, as articulated in *Marx & Co. v. Diners' Club, Inc.*, the jury may believe the attorney-witness, who is presented to them imbued with all the mystique inherent in the title "expert," is more knowledgeable than the judge in a given area of the law. . . .

Second, testimony on ultimate issues of law by the legal expert is inadmissible because it is detrimental to the trial process. If one side is allowed the right to call an attorney to define and apply the law, one can reasonably expect the other side to do the same. . . . The potential is great that jurors will be confused by these differing opinions, and that confusion may be compounded by different instructions given by the court . . . .

*Specht*, 853 F.2d at 809-10. For this reason, "certain narrow and well-defined categories exist within which legal testimony is appropriate." *Willette*, 778 F. Supp. at 11. The example given by the *Willette* court is testimony on issues of foreign law. *Id.*

As neatly summed up in a First Circuit case: "Courts generally have held legal opinion testimony inadmissible under Fed. R. Evid. 702." *Candelaria v. Rodriguez*, 344 F.3d 103, 114 (1st Cir. 2003). The lawyers' testimony offered in almost all of these cases was excluded:

- *Marx & Co.*, 550 F.2d 505: The Second Circuit reversed a jury verdict in the plaintiffs' favor because of improper testimony by a "securities law expert" in giving his opinions regarding: (1) the parties legal obligations under the contract at issue; (2) the legal standards which he believed derived from the contract and which should have governed the defendant's behavior; and (3) his conclusions as to the legal significance of various facts adduced at trial.

- *Specht*, 853 F.2d 805: The Tenth Circuit reversed a jury verdict in the plaintiffs' favor in a damages case under 42 U.S.C. § 1983 for allegedly illegal searches, because of improper testimony by an attorney, called as an expert witness and permitted to state his views of the law which governed the verdict and whether the defendants' conduct violated that law.

- *Willette*, 778 F. Supp. 10: The court in the Eastern District of Louisiana excluded the proffered testimony of a lawyer with expertise on the issue of "informed consent" in a medical malpractice case.

- *Bausch & Lomb*, 79 F. Supp. 2d 252: The court in the Western District of New York excluded much of the proffered testimony of a patent lawyer in a patent infringement suit, on issues relating to the effective filing date of the patent and various invalidity defenses.

While this objection applies to Mr. Kam's testimony in general, it is most on point regarding his proffered testimony about the "nature of FMVSSs." The definition of "motor vehicle safety standard" for purposes of the Federal Motor Vehicle Safety Act is set forth in 49 U.S.C. § 301102:

> (9) 'motor vehicle safety standard' means a minimum standard for motor vehicle or motor vehicle equipment performance.

49 U.S.C. § 301102(9).

Mr. Kam's "opinion" that the FMVSSs are minimum standards is nothing more than a recitation of this statutory definition. Similarly, his "opinions" that compliance with FMVSSs does not mean that a vehicle is not defective; that enforcement of FMVSS compliance and defect investigations are subject to certain statutes of limitations; and that NHTSA follows certain procedures set forth in the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, are merely recitations of the law. His report even cites the relevant statutes and regulations, with one exception. [Kam Report, Ex. A.] The exception is the relevant Texas statute, which provides that:

> In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller is not liable for any injury to a claimant caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that the product's formula, labeling, or design complied with mandatory safety standards or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm.

Tex. Civ. Prac. & Rem. Code § 82.008(a).

Mr. Kam has no opinion regarding the effect of this statute, having admitted that he is not an expert in Texas law. [Kam Depo, Ex. B, at 42-43.]

Further, Mr. Kam's broad criticisms of Ford's and the industry's influence on NHTSA is inadmissible. As noted above, Mr. Kam has <u>no</u> personal knowledge regarding such influence, as he did not work on the rulemaking at issue in this case. Nor does he

have any evidence that particular conduct by Ford or others improperly influenced rulemaking on either FMVSS 216 or on rollover resistance. His testimony is just like the generic criticism by another lawyer, of another government agency [the Patent and Trademark Office (PTO)], that was properly excluded in the *Bausch & Lomb* case:

> [The lawyer] also states, however, that he expects to testify about "the problems Examiners encounter with the completeness or 'file integrity' of the 'shoes' maintained at the PTO," the "difficulties Examiners face in discovering and obtaining prior art references other than patents." . . . He also "intend[s] to explain the time constraints under which Examiners in the PTO must operate." . . . I find such testimony to be inadmissible. It appears that the purpose of this testimony is to undermine the presumption of validity under 35 U.S.C. § 282 by inviting the jury to speculate about possible defects, errors, or omissions in the application process that led to the issuance of the patent-in-suit . . . . If [defendant] has evidence that there actually were defects in the particular application process at issue in this case, thus suggesting that deference to the PTO's determination may not be appropriate, it may seek to offer such evidence. But generalized testimony about "problems" in the PTO is not admissible.

79 F. Supp. 2d at 255-56.

Mr. Kam's proffered testimony about Ford and industry influence over NHTSA, over NHTSA being in a "deregulatory" environment, and regarding the "limited resources" of NHTSA, are precisely this type of impermissible testimony about generic "problems" at the agency. They should be excluded in their entirety. His proposed testimony about the "history" of rulemaking regarding FMVSS 216 and rollover resistance is nothing but an argumentative commentary on the documents that Mr. Kam reviewed, as he did not work on either of these matters while at NHTSA.

In essence, Plaintiff intends to use Mr. Kam to present a combination final argument and jury instructions on issues relating to Ford's compliance with FMVSS, particularly FMVSS 216, and that presumption of nondefectiveness resulting from Tex. Civ. Prac. & Rem. Code § 82.008. Neither the Court nor the jury need this assistance to interpret the documents, and if Plaintiff wants Mr. Kam to present their closing on this issue, they should retain him as counsel, not present him as a witness. Such testimony is improper and should be excluded.

13

### E.   Hearsay

Finally, Mr. Kam's report suggests Plaintiff's intention to use him as a conduit for evading hearsay objections. Expert witnesses are permitted to rely on inadmissible facts or data only if it is "of a type reasonably relied upon by experts in the particular field." Fed. R. Evid. 703. Further, such "[f]acts or data that are not otherwise admissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." *Id.*  Even in the rare instances that such otherwise inadmissible hearsay would become admissible under this balancing test, "the trial judge must give a limiting instruction upon request, informing the jury that the underlying information must not be used for substantive purposes." *Id.* (Advisory Committee's Note, 2000 Amendment).

This rule applies with extra force where, as here, the "expert" has no real expertise at all, but is merely used to repeat the likely inadmissible hearsay. The hearsay listed below is inadmissible both because it is not of a type reasonably relied upon by experts in Mr. Kam's field of expertise (if such can even be determined), and because admission of this evidence solely to bolster Mr. Kam's testimony does not substantially outweigh the prejudice of admission of this otherwise inadmissible hearsay. The hearsay at issue includes the following:

- A January 5, 1981, letter written by NHTSA Chief Counsel Frank Berndt regarding "minimum standards." [Kam Report, Ex. A, at 8.]

- A November 28, 1980, letter written by NHTSA Administrator Joan Claybrook regarding "minimum standards." [*Id.*, at 9, 24.]

- A September 14, 1999, letter written by NHTSA Administrator Ricardo Martinez regarding "minimum standards." [*Id.*]

- A May 22, 1998, letter from NHTSA to Ford regarding defect investigations. [*Id.*, at 13.]

- A September 6, 1988, letter from NHTSA to Suzuki regarding defect investigations. [*Id.*]

- A 1995 study by Australian government officials "Henderson & Paine"

14

regarding FMVSS 216. [*Id.*, at 15-16.]

- A statement made in a January 4, 2001, television interview by former NHTSA Administrator Sue Bailey regarding FMVSS 216. [*Id.*, at 16, 26-27.]

- Transcripts of tape recordings of an April 27, 1971, meeting between President Nixon, John Erlichman, Henry Ford II, and Lee Iacocca. [*Id.*, at 19-20.]

- Transcripts of tape recordings of an April 27, 1971, meeting between President Nixon, John Erlichman, and Ford representative Henry Ford II and Lee Iacocca. [*Id.*, at 19-20.]

- Transcripts of tape recordings of an May 13, 1971, meeting between President Nixon, John Erlichman, and GM representative James Roche. [*Id.*, at 20-21.]

- Several depositions of John Erlichman taken in various General Motors cases and one Ford case. [*Id.*, at 21.]

- A May 17, 1971 "confidential memorandum" from John Erlichman to Charles Colson, a White House aide. [*Id.*, at 21-22.]

- Trial testimony of former NHTSA Administrator Douglas Toms in a General Motors case. [*Id.*, at 22.]

- A deposition of former NHTSA Deputy Director and Chief Scientist Robert Brenner. [*Id.*, at 22.]

- A July 1985 report by a NHTSA contractor regarding window glass and roof strength. [*Id.*, at 24.]

- A September 1991 NHTSA-sponsored study regarding modifications to a 1989 Nissan pickup. [*Id.*, at 25.]

- A May 1996 rulemaking petition by R. Ben Hogan regarding roof strength. [*Id.*, at 25.] (Mr. Hogan is a plaintiffs' lawyer.)

- An April 7, 2002, Dallas Morning News article quoting NHTSA spokesperson Rae Tyson regarding FMVSS 216. [*Id.*, at 28.]

- February 2003 testimony of NHTSA Administrator Jeffrey Runge before the Senate Commerce Committee regarding FMVSS 216. [*Id.*, at 28.]

- February 2003 testimony of former NHTSA Administrator Joan Claybrook before the Senate Commerce Committee regarding FMVSS 216. [*Id.*, at 28-29.]

- February 2003 testimony of Consumer's Union representative David Pittle repeating a purported statement by former NHTSA Administrator Ricardo Martinez that NHTSA is "outgunned, outmanned and outspent by the industry." [*Id.*, at 29.]

- An April 11, 2004, Detroit News article quoting NHTSA Administrator Jeffrey Runge regarding FMVSS 216. [*Id.*, at 30.]

- A different April 11, 2004, Detroit News article quoting former NHTSA Administrator Ricardo Martinez regarding FMVSS 216. [*Id.*, at 30.]

- A September 21, 1971 letter from NHTSA to the Army regarding the proposed sale of Jeep M151 vehicles. [*Id.*, at 31.]

- A statistical study by Robertson and Kelley. [*Id.*, at 33.]

- A 1986 statistical study by Harwin and Brewer. [*Id.*, at 34.]

- A 1988 NHTSA-sponsored statistical study by Mengert *et al.* [*Id.*, at 34.]

- A May 22, 1998, letter from NHTSA to Ford regarding a Bronco II investigation. [*Id.*, at 34.]

- A 2002 book ("Bradshaw, *High and Mighty*") that, according to Mr. Kam, indicates that the "industry" urged Senator Richard Shelby to require a study in order to delay implementation of a rollover rating system by NHTSA. [*Id.*, at 39.]

Even if such hearsay is admissible, it speaks for itself, requiring no interpretation from Mr. Kam. His testimony on these issues, therefore, is both impermissible and irrelevant.

## III.   CONCLUSION

For the foregoing reasons, Mr. Kam's testimony is inadmissible under *Daubert*, Rule 702, and Rule 403. Therefore, Mr. Kam's testimony should be excluded in its entirety.

. . . .

. . . .

Respectfully submitted,

BROWN McCARROLL, L.L.P.
111 Congress Avenue, Suite 1400
Austin, Texas  78701
(512) 472-5456
(512) 479-1101

By: _____
John W. Chambless (Attorney-in-Charge)
State Bar No. 00796334
Ronald D. Wamsted
State Bar No. 20832000

and

Gerald F. Giordano, Jr.
SNELL & WILMER, L.L.P.
One S. Church Ave., Suite 1500
Tucson, Az  85701-1630
520/882-1200
520/884-1294 (FAX)
Arizona State Bar #019097
(Admitted Pro Hac Vice)

**ATTORNEYS FOR DEFENDANT**
**FORD MOTOR COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all known counsel of record as set forth below by facsimile and by certified mail, return receipt requested, in compliance with the Federal Rules of Civil Procedure on this ___31st___ day of January, 2005.


**Via Certified Mail**

Brantley White
900 Frost Bank Plaza
802 N. Carancahua
Corpus Christi, TX  78470


Gerald F. Giordano, Jr.


35577 1932\GIORDAG\TUX\357002

11



# Highway Traffic Safety Associates, LLC

Consulting on Federal motor vehicle safety issues

Allan J. Kam, Director
E-mail: akam@HTSAssociates.com

8504 Meadowlark Lane Bethesda, MD 20817-2921
Telephone: 301-469-8615 · Fax: 301-469-7200

# EXPERT REPORT IN
# *JOSE HERNANDEZ v. FORD MOTOR COMPANY*

**Expert Report Prepared for
Brantley White, Esq.
Sico, White & Braugh**

**October 18, 2003**

Hernandez,   Irma
1377-002725

**EXPERT REPORT IN *JOSE HERNANDEZ V. FORD MOTOR COMPANY***

**Table of Contents**

page

I. Introduction 1

II. Author's Qualifications 1

III. Records Reviewed 3

IV. Background on NHTSA and the Safety Act 4

    A. The Safety Agency 4

    B. The Rulemaking Process 4

V. Federal Motor Vehicle Safety Standards 6

    A. What Are Federal Motor Vehicle Safety Standards? 6

    B. A FMVSS is Only a Minimum Standard 7

    C. Organization of FMVSSs 10

    D. Manufacturers Self-Certify Compliance with FMVSSs 11

    E. NHTSA's Office of Vehicle Safety Compliance Has Very Limited Resources 12

    F. Compliance with FMVSSs Does Not Mean That a Vehicle is Safe 12

VI. History of NHTSA Rulemaking on Roof Crush Resistance 14

    A. Introduction – The Existing Standard 216 14

    B. FMVSS 216 Rulemaking Actions 17

        1. 1967 ANPRM 17

        2. January 1971 Proposal 18

        3. Industry Influence outside the formal rulemaking record 19

        4. December 1971 Final Rule 23

        5. Events After 1971 24

        6. October 2001 Rulemaking Notice 27

Hernandez,   Irma
1377-002726

7. Other Recent Events     28

VII. History of NHTSA Rulemaking on Rollover Resistance     30

    A. Introduction and Overview of NHTSA's Rollover Resistance Rulemaking     30

    B. Significant Events in NHTSA's Consideration of Rollover Resistance Rulemaking     31

      1. NHTSA comments to Army on Jeep M151     31

      2. 1973 ANPRM     31

      3. The Wirth Petition     33

      4. Consumers Union 1988 Petition     34

      5. January 1992 ANPRM     34

      6. September 1992 Agency Planning Document     36

      7. June 1994 Notice Terminating FMVSS Rulemaking and Proposing Consumer Information Regulation     36

      8. 1994 Legislation and First NAS Study     37

      9. Consumers Union 1996 Petition Granted in May 1997     38

      10. NHTSA Decides to Use SSF in NCAP Program     38

      11. TREAD Act Requires Dynamic Rollover Test     40

VIII. Summary and Observations     42

Signature and Date     42

Attached Exhibits:

    Exhibit 1:  C.V. of Allan J. Kam

    Exhibit 2:  Testimony as Expert Witness

Hernandez,   Irma
1377-002727

# Highway Traffic Safety Associates, LLC

Consulting on Federal motor vehicle safety issues

Allan J. Kam, Director

E-mail: akam@HTSAssociates.com

8504 Meadowlark Lane Bethesda, MD 20817-2921

Telephone: 301-469-8615 · Fax: 301-469-7200

## Report for *Jose Hernandez* v. *Ford Motor Company*

### I. Introduction

I was asked by counsel for plaintiff in the *Hernandez* case, Brantley White, to explain the nature of Federal motor vehicle standards (FMVSSs) in general, and to summarize the rulemaking history of Federal motor vehicle safety standard (FMVSS) 216, *Roof Crush Resistance*. Also, although there is no FMVSS for rollover prevention, I was asked to summarize the history of the National Highway Traffic Safety Administration's (NHTSA) rulemaking activities that considered a rollover prevention FMVSS. Concerning my summaries of these rulemaking histories, I was asked to note participation by Ford Motor Company (hereinafter: "Ford") and trade associations to which Ford belonged.

### II. Author's Qualifications

I hold the law degree of Juris Doctor With Honors from The George Washington University Law School. My educational and employment history is set forth more fully in my Curriculum Vitae (C.V.), a true copy of which is attached hereto as Exhibit 1. The C.V. also contains a list of publications I have authored.

On April 30, 2000, I retired from the National Highway Traffic Safety Administration (NHTSA), United States Department of Transportation (DOT), after more than twenty-five years of service as an attorney in the NHTSA Office of the Chief Counsel. During my career at

Hernandez,   Irma
1377-002728

NHTSA, I received numerous NHTSA and DOT performance awards.  Upon my retirement from NHTSA I was presented with the agency's Distinguished Career Service Award.

Having worked as an enforcement attorney at NHTSA for more than 25 years, I am familiar with the general statutory and regulatory requirements placed upon manufacturers of motor vehicles and motor vehicle equipment with respect to compliance with FMVSSs; the procedures NHTSA follows in issuing FMVSSs; and the nature of FMVSSs as minimum performance requirements.

Since my retirement from NHTSA, through Highway Traffic Safety Associates, LLC, I have provided consulting services on safety defect, standards compliance, and regulatory issues affecting motor vehicles and motor vehicle equipment.  I have consulted to manufacturers of motor vehicles and motor vehicle equipment.  Such consultation to manufacturers has been both inside and outside of a litigation context.  When consulting in a litigation context, including potentially as an expert witness, I have provided services to both plaintiffs and defendants.

Although retired from NHTSA, I have continued to monitor developments in the agency, such as implementation of the Transportation Recall Enhancement, Accountability, and Documentation (TREAD) Act (Public Law 106-414), signed into law on November 1, 2000.

While most of my expertise was acquired through my more than 25 years experience at NHTSA, I want to clarify at the outset of this report that I am not purporting to speak for NHTSA. The opinions and conclusions in this report are mine.  NHTSA has confirmed that that I am permitted under the DOT employee regulation to provide testimony in the general areas covered by this report.

My analysis, opinions and conclusions are based on my education, training and experience, my review of relevant materials in this case (including materials from NHTSA

2

Hernandez, Irma
1377-002729

rulemaking dockets), and federal law and regulations administered by NHTSA. This report is based on information currently available to me. I reserve the right to amend, revise, or supplement this report if additional information becomes available.

Exhibit 2 hereto contains a listing of those cases in which I have testified as an expert at trial or by deposition within the preceding four years.

I am being compensated for my time in preparing this analysis at my usual and customary hourly rate as of the date that I was retained in the *Hernandez* case, which is $380 per hour. Exhibits to be used at trial in connection with my testimony have not yet been determined.

## III.  Records Reviewed

My analysis for the *Hernandez* case has included a review of the following:

- • Plaintiff's First Amended Original Complaint

- • College Station Police Accident Report

- • Photographs

- • Subpoena and Deposition Upon Written Questions to College Park Police Department

- •.CD-Rom "Hernandez Vehicle Photos by Irwin"

- • Compendiums for FMVSS 216 and for Rollover Prevention

- • Statutes, regulations, NHTSA interpretation letters, and other materials cited in this report

- • Redwell file of background/reference materials on roof crush and rollover

Hernandez,   Irma
1377-002730

## IV. Background on NHTSA and the Safety Act

A.  The Safety Agency

NHTSA is the federal agency responsible for issuing and enforcing safety standards concerning the manufacture of motor vehicles and motor vehicle equipment, and for investigating alleged defects in those vehicles and equipment. It is a relatively small agency, with approximately 630 employees. The Secretary of Transportation delegated to the NHTSA Administrator the authority to administer the National Highway Traffic and Motor Vehicle Safety Act of 1966.[1]  For simplicity, that basic statute (including its predecessor) is referred to herein as "the Safety Act," and the Secretary's authority as that of NHTSA.  Also for simplicity herein, the terms NHTSA and "the agency" are used herein interchangeably to refer to the federal government entity or its head (e.g., the Secretary of Transportation, or Administrator of NHTSA or its predecessor agency) responsible for administering the Safety Act.[2]

B.  The Rulemaking Process

In the Safety Act, Congress gave the agency the authority to issue FMVSSs, and that authority is exercised through a process known as rulemaking.  NHTSA's issuances of FMVSS, or amendments thereto, are preceded by notice-and-comment rulemaking proceedings.  Each

---

[1] The Safety Act was formerly codified at 15 U.S.C. 1381 *et seq.* It was repealed, reissued, and recodified in 1994 as Chapter 301 of Title 49 of the United States Code. Under the recodification, the same basic statutory provisions remain as in the predecessor Act.  Their administration is still delegated to the NHTSA Administrator, and portions thereof are redelegated within NHTSA. (49 C.F.R. §§ 1.51, 501.8).

[2] The original Safety Act conferred authority to administer it on the Secretary of Commerce. By subsequent legislation, Congress transferred all powers under the Safety Act to the Secretary of Transportation. (49 U.S.C. § 1655(a)(6)(A).)  The Secretary had delegated these powers, with several exceptions not relevant here, to the Federal Highway Administration until March 22, 1970, when they were withdrawn and delegated to the National Highway Safety Bureau, contemporaneously with the Bureau's separation from the Federal Highway Administration and elevation within the Department of Transportation to the status of an administration. (49 U.S.C. § 1.51, 35 Fed. Reg. 4955.)  On January 1, 1971, the Bureau was renamed the National Highway Traffic Safety Administration (NHTSA) and the delegations of authority were amended to reflect the change in title.  The current delegation to the Administrator of the NHTSA to administer the Safety Act appears at 49 C.F.R. § 1.51.

Hernandez,   Irma
1377-002731

time NHTSA publishes an Advance Notice of Proposed Rulemaking (ANPRM) or Notice of Proposed Rulemaking (NPRM) in the Federal Register, the public is invited to comment on that particular notice. Each ANPRM and NPRM, and all comments NHTSA receives thereon, are entered into a rulemaking docket maintained by the agency. A rulemaking docket is a file consisting of all substantive written notices, comments to notices, communications, reports and other materials relating to a particular rulemaking action.

The notices and invitations to comment are issued in compliance with the Administrative Procedure Act (APA), 5 U.S.C. §551 *et seq.*, under which NHTSA has conducted its rulemaking throughout the history of the agency. An ANPRM is an optional notice, not required by the APA, which announces that the agency is considering the advisability of issuing a rule in an area, and invites the public to comment on the general subject matter. The ANPRM may also invite comment on areas of concern specified in the notice. In practice, NHTSA may issue an ANPRM as an information-gathering tool, or where the agency may be uncertain that it wants to proceed with a rule, and would like comment on the subject matter. An ANPRM may or may not lead to an NPRM and a final rule. Because an ANPRM is not the APA-required notice of a specific proposed rule, an agency cannot proceed directly from an ANPRM to a final rule without issuing an NPRM. The NPRM is the APA-required notice of a proposed rule, and must be sufficiently focused to put the public on notice of the scope of the proposed rule. In practice, NHTSA sets forth the actual text of the proposed rule in its NPRM's.

NHTSA has always utilized the APA's procedures for informal rulemaking (5 U.S.C. §553), rather than the procedures for formal or adjudicative rulemaking. Informal rulemaking is a quasi-legislative process in which the public is given notice of, and opportunity to comment on, rulemaking notices. The agency's regulation on rulemaking procedures, found at 49 C.F.R. Part

Hernandez,  Irma
1377-002732

553, tracks the APA's notice and comment requirements for informal rulemaking.  Specifically, the regulation sets forth requirements for the content of notices of proposed rulemaking (49 C.F.R. §553.15), and provides that any interested person may submit written comments (49 C.F.R. §553.17), and that the agency must consider all timely comments before taking final action on a rulemaking proposal.  Late (untimely) comments may be considered as far as practicable (49 C.F.R. §553.23).   NHTSA's consideration of comments is reflected in the preamble to a final rule.  The preamble, among other things, contains a discussion of significant comments, and generally explains the agency's resolution of the issues raised in those comments.

## V. Federal Motor Vehicle Safety Standards

### A.  What are Federal Motor Vehicle Safety Standards?

NHTSA regulates the safety of vehicles by the issuance of regulations known as Federal Motor Vehicle Safety Standards (FMVSSs), as well as through defect investigations of alleged safety-related defects.  FMVSSs are minimum performance standards that NHTSA has issued for certain aspects of performance in motor vehicles and motor vehicle equipment.    As performance standards, they do not mandate technology, and they are minimum, not maximum or optimal, standards.  NHTSA has urged manufacturers to exceed these minimum standards.

The National Traffic and Motor Vehicle Safety Act of 1966, which was reissued as Chapter 301 of 49 U.S.C., authorizes NHTSA to issue FMVSSs  (49 U.S.C. § 30111), and prohibits a manufacturer from selling vehicles and equipment that do not comply with an applicable FMVSS in effect at the time of their manufacture.  (49 U.S.C. § 30112.)  NHTSA has the authority to order a recall, both for FMVSS noncompliances and for safety-related defects.  However, the

6

Hernandez,   Irma
1377-002733

agency cannot order a manufacturer to recall vehicles or equipment (except tires) that were first sold more than ten years before it was determined that they failed to comply with an applicable FMVSS (when new) or that they contain a safety-related defect. For tires the limitations period on a mandatory recall is five years. Prior to the enactment of the TREAD Act in November 2000, those limitations periods were only eight years for vehicles (and equipment other than tires), and three years for tires.

### B. A FMVSS is Only a Minimum Standard

The Safety Act defines a motor vehicle safety standard as a "minimum" standard for motor vehicle or motor vehicle equipment performance. (49 U.S.C. § 30102(a)(8).) Thus, a FMVSS does not establish the state of the art, or an optimal level of performance, but rather a minimum level of performance that a manufacturer must meet in order to sell its product.

A manufacturer's compliance with these minimum standards does not relieve a manufacturer from any duties or responsibilities under common law to design safe vehicles. Congress has provided that compliance with an FMVSS does not constitute a defense in a product liability suit. (49 U.S.C. § 30103.) *See* H.R. Rep. No. 1776, 89th Cong. 2nd Sess (1966) at p. 24 ("It is intended, and this subsection [§ 108(c) of the original Safety Act] specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those relating to warranty, contract, and tort liability.") In other words, FMVSSs do not define a manufacturer's total responsibility for the safe design and of its motor vehicles or motor vehicle equipment; compliance with applicable FMVSSs does not relieve a manufacturer of its duty to safely design its products, and to identify and remove safety defects therein. FMVSSs are not intended to define what is a safe product

7

under all circumstances, or to relieve a manufacturer from its responsibility to design a safe product.

Moreover, FMVSSs do not cover every aspect of performance of motor vehicles and equipment. The agency does not have the resources to perform such a huge and nearly infinite undertaking. Rather, FMVSSs cover only a limited number of aspects of performance, and even as to those aspects, FMVSSs only apply to new motor vehicles and motor vehicle equipment until their first sale for purposes other than resale.[3]

NHTSA Chief Counsel Frank Berndt, in a formal interpretation letter on behalf of the agency, explained that

> Each of our standards meets the need for motor vehicle safety by specifying requirements for the performance of a particular vehicle system or item of equipment. …. [A standard] does not require the use of a specific design. Thus, manufacturers need not use the most effective design available. They may use any design that will satisfy the performance requirements of the standard. It also does not require that manufacturers limit their chosen design to the performance levels specified in the standard. The performance requirements are minimum, not maximum, ones. Manufacturers are free to select designs which exceed those in the safety standards.
>
> Although our safety standards meet the need for safety, they do not necessarily attempt to solve the full extent of a particular safety problem."[4]

The Safety Act provides that each FMVSS issued by the agency shall, *inter alia*, "meet the need for motor vehicle safety." (49 U.S.C. § 3011(a).)   This means that FMVSSs must

---

[3] Thereafter, the notion of FMVSS compliance is not pertinent. If a product degrades in use, so that after a while it would no longer meet the performance requirement of an FMVSS, NHTSA can only pursue it as a safety-related defect, inasmuch as FMVSSs do not apply to used products, i.e., vehicle and equipment after their first sale.

[4] Letter from NHTSA Chief Counsel Frank Berndt to Daniel L. Thistle, January 5, 1981, at pp. 1-2.. The NHTSA Chief Counsel has the delegated authority to "issue authoritative interpretations of the statutes administered by NHTSA and the regulations issued by the agency." 49 C.F.R. § 501.8(d)(4). *See also* NHTSA website at http://www.nhtsa.dot.gov/cars/rules/interps/welcome ("NHTSA's Chief Counsel interprets the statutes that the agency administers and the regulations that it promulgates. The Chief Counsel's interpretations, issued in the form of letters responding to questions from the motor vehicle industry and the public, represent the definitive view of the agency ….").

8

Hernandez,   Irma
1377-002735

serve a *safety* purpose, rather than a non-safety purpose (such as conserving energy or regulating the national economy).   Sometimes a defendant manufacturer in a products liability case tries to make or imply the specious argument that, since FMVSSs must "meet the need for motor vehicle safety," and since its vehicle met the FMVSS requirements, therefore the vehicle must be safe.  But, as the aforementioned interpretation letter from Chief Counsel Berndt clearly indicates, FMVSSs do not solve the entire safety problem just because each FMVSS is supposed to "meet the need for motor vehicle safety."   Moreover, since FMVSSs are generally written as *performance* standards, not *design* standards, it is possible for a manufacturer, in designing a part or system to comply with an FMVSS, to choose a smart design resulting in a non-defective product, or a poor design resulting in a defective product.

The agency has repeatedly urged manufacturers to design their products to do more than merely meet the minimum "floor" required in NHTSA's standards.   For example, NHTSA Administrator Joan Claybrook wrote to manufacturers that "[o]ur Federal safety standards are and were intended by Congress to be minimum standards.   The tragedy is that many manufacturers have treated the standards more like ceilings on safety performance than floors from which to improve safety."  (Letter from NHTSA Administrator to several manufacturers, November 28, 1980, at p. 2.) A later NHTSA Administrator, Dr. Ricardo Martinez, wrote that "mere compliance with the minimum requirements of the standard is not enough; minimum standards should not be the most in safety design that manufacturers provide."  (Letter from NHTSA Administrator to several manufacturers, September 14, 1999, at p. 2.)

9

Hernandez,   Irma
1377-002736

## C. Organization of FMVSSs

There are now more than fifty FMVSS.  They are identified by numbers, e.g., Standard 208, and are found at § 571 of volume 49 of the Code of Federal Regulations.  The 100 series of FMVSS are crash avoidance standards, governing such things as windshield wipers (Standard 104), headlamps (Standard 108), and tires (Standards 109 and 119).  The 200 series are crashworthiness standards, regulating devices such as air bags (Standard 208), child safety seats (Standard 213), and roof crush (Standard 216).  The 300 series are post-crash standards governing issues like fuel system leakage (Standard 301) and flammability of interior materials.

Many of NHTSA's FMVSSs are also quite lenient.  Only a few of those standards are addressed in the TREAD Act, which requires NHTSA to conduct certain specified rulemaking proceedings.[5]  The agency has the general authority in the Safety Act to upgrade any or all of the other FMVSS, but, as a practical matter, is limited by resources, not to mention political willpower.  The TREAD Act resulted from the extraordinary national publicity and Congressional hearings growing out of the Ford-Firestone controversy in 2000.  That intense level of Congressional oversight of NHTSA, and Congressional consensus about the need for legislation directing NHTSA to issue or upgrade certain standards, has not carried over after September 11.  Although NHTSA has been conducting (and in some cases completed) the rulemaking proceedings required by the TREAD Act, as well as some other rulemaking activities not mandated by the TREAD Act, NHTSA has generally been in a deregulatory environment since 1981. Most of the FMVSS were initially issued in the late 1960's and 1970's.[6]

---

[5] The TREAD Act requires rulemaking in a number of areas, including early warning reporting requirements; tire safety standards; tire labeling; low tire pressure warning; rollover tests; and child restraints.

[6] There have been many amendments to FMVSSs, sometimes as a result of Congressional directives. Probably the most controversial and litigated FMVSS has been Standard 208 (Occupant Crash Protection), which has been the subject of many rulemaking notices, court decisions, and Congressional directives.

Hernandez,   Irma
1377-002737

### D. Manufacturers Self-Certify Compliance with FMVSSs

Although NHTSA has the authority to monitor and investigate compliance with FMVSSs through its Office of Vehicle Safety Compliance (OVSC), the duty to certify compliance with FMVSS resides with the manufacturer. It is the responsibility of the manufacturer of motor vehicles and/or motor vehicle equipment (*e.g.*, tires) to certify that each motor vehicle or item of equipment is in compliance with the minimum performance requirements of all applicable FMVSS. This process is known as "self-certification." Thus, OVSC does not issue approval tags, stickers or labels for vehicles or equipment, either before or after their first sale. NHTSA does not "approve" or "certify" that vehicles and equipment meet FMVSSs, or that they are "safe." In that respect, NHTSA's function is quite different from that of the Food and Drug Administration (FDA), which must approve drugs and medical devices before they can be sold.

Additionally, OVSC does not specify the type of quality control program that a manufacturer should employ. That is in the domain of the manufacturer. Again, OVSC does not function like the FDA, or for that matter the Agriculture Department's meat inspectors. There is no NHTSA "stamp of approval" that goes on tires or other items of equipment or on motor vehicles – just self-certification by the manufacturer.

Technically, the Safety Act does not actually direct a manufacturer to conduct testing before it certifies that its vehicles or equipment comply with FMVSS. While a prudent manufacturer may be wise to conduct such testing, in theory the manufacturer is free to determine compliance by engineering judgment, computer simulations, or any other bases. Absent a specific request from NHTSA in a particular enforcement investigation, manufacturers do not routinely report to NHTSA their compliance testing or other bases for their self-certification of compliance with applicable FMVSS.

11

Hernandez,   Irma
1377-002738

### E. NHTSA's Office of Vehicle Safety Compliance Has Very Limited Resources

OVSC has limited resources, and consequently conducts only limited surveillance testing. Due to budgetary limitations, it does not, by any means, test every, or even most, makes and models or items of motor vehicle equipment products for compliance with FMVSSs.

OVSC has a professional staff of about 30 to enforce the agency's standards. OVSC enforces not only FMVSSs, but also other regulations, such as NHTSA's consumer information regulations (49 CFR Part 575), theft prevention standard (49 CFR Part 541), automotive contents labeling (49 CFR Part 583), vehicle identification number content (49 CFR Part 565), manufacturer identification (49 Part 566), certification regulation (49 CFR Part 567), second stage manufacturers (49 CFR Part 568), and others. OVSC has only one staff engineer assigned to FMVSS 216, and she also has several other standards assigned to her.

Although OVSC develops an annual compliance test program, under which it selects samples from the marketplace and tests them to the minimum performance requirements of the applicable FMVSSs, in a typical year, OVSC's compliance test program would include only an average of 30 FMVSSs.

### F. Compliance with FMVSSs Does Not Mean That a Vehicle Contains No Defect

If a new vehicle complies with all applicable FMVSSs, that does not mean that cannot or should not be recalled for safety problems. The Safety Act also requires that a manufacturer recall vehicles or equipment that "contain a defect that relates to motor vehicle safety,"[7] which is

---

[7] 49 U.S.C. § 30018(c)(1) provides that a manufacturer shall notify the agency and owners when it "learns that a vehicle or equipment contains a defect and decides in good faith that the defect is related to motor vehicle safety." In enforcing this requirement, NHTSA has construed this provision to mean that an actual safety defect decision *per se* by the manufacturer is not necessary to establish a violation of § 30018(c)(1), if the facts are such that the manufacturer *should have* in good faith made such a determination. In other words, a manufacturer can not lawfully avoid its recall responsibilities by "playing ostrich," ignoring the evidence of a safety defect. The precursor to § 30118(c), which contained substantially similar language, has

Hernandez,   Irma
1377-002739

commonly referred to as a "safety-related defect." The Act also authorizes NHTSA to investigate and order the manufacturer to recall vehicles and equipment containing a safety-related defect. NHTSA has not actually ordered such a recall since 1979, although it has influenced manufacturers to initiate many recalls.

NHTSA has long had the authority to investigate safety-related defects in trucks.[8] However, the agency's Office of Defects Investigation (ODI), like OVSC, has limited resources.

ODI does not make findings of "no defect."   In fact, NHTSA has specifically asked Ford to ensure that its outside counsel in product liability cases refrain from mischaracterizing the agency's decisions to close defect investigations as "no defect" decisions.  (Letter from NHTSA to Ford, May 22, 1998, p. 4).  Similarly, the decision to deny a petition or request for ODI to conduct a defect investigation "is not in any way an endorsement of the safety performance of a vehicle, nor does it mean that the agency has determined that the vehicle does not contain a safety-related defect."  (Letter from NHTSA to Suzuki, September 6, 1988.)  Thus, NHTSA's decision not to grant Bridgestone/Firestone's "request" (not a formal petition, *per se*) that the agency open a safety defect investigation regarding the handling and control characteristics of Ford Explorer vehicles following a tread separation of a rear tire, does not constitute a determination by NHTSA that the vehicles do not contain a safety-related defect.

---

been held to impose on a manufacturer the duty "to notify and remedy whether it actually determined, *or it should have been determined*, that its [products] are defective and the defect is safety-related." *United States v. General Motors Corporation (X-Cars)*, 656 F. Supp. 1555, 1559 n.5 (D.D.C. 1987) (emphasis added), *affirmed* 841 F.2d 400 (D.C. Cir. 1988), citing *United States v. General Motors Corp.*, 574 F. Supp. 1047 (D.D.C. 1983).

49 U.S.C. 20120(a)(1) provides that where there is notification of a safety-related defect, the manufacturer shall offer to remedy the defect without charge.  This notification and remedy is commonly known as a recall.

[8] For an analysis of what constitutes a safety-related defect under the Safety Act, and how NHTSA's Office of Defects Investigation (ODI) conducts safety defect investigations, *see* Kam, *Understanding NHTSA Safety Defect Investigations*, 20 PRODUCTS LIABILITY LAW REPORTER 185 (2001).

Hernandez,  Irma
1377-002740

## VI.  History of NHTSA Rulemaking on Roof Crush Resistance

A. Introduction and Overview - The Existing Standard 216

FMVSS 216 sets performance requirements for roof crush resistance over the passenger compartment. The current standard is largely unchanged from when it was first issued for passenger cars more than 30 years ago, based on research from the 1960's of Fisher Body Division of General Motors.  (Henderson & Paine, Passenger Car Roof Crush Strength Requirements, § 6.)  FMVSS 216 was later extended to light trucks with a GVWR of 6,000 pounds (2722 kilograms) or less.[9]  FMVSS is essentially a static test or quasi-static test in which a platen is pushed at a controlled rate near the A-pillar/roof header junction.[10] The test can take up to 2 minutes.  The vehicles passes 216 if the vehicle crushes less than 5 inches before the load reaches 1½ times the unloaded weight of the vehicle (or 5,000 lbs., whichever is less, for passenger cars).   More detail, with citations to the Standard's sections, are provided in footnote 10, below.

_____

[9] The Explorer (4-door Ford Explorer Limited) reportedly had a curb weight of 4440 pounds, and a maximum load capacity of 978 pounds, which would mean a GVWR of approximately 5418 pounds.  (Sport-Utility Vehicles, Consumer Reports, August 1995, at p. 550.)  Thus, it appears that the 1996 Ford Explorer at issue in the Hernandez case was required by meet FMVSS 216, inasmuch as its GVWR was less than 6,000 pounds.

[10] The FMVSS 216 test procedures provide that the sills or the chassis frame of the vehicle be placed on a rigid horizontal surface, the vehicle be fixed rigidly in position, and that all windows, doors, and locks be closed.  (49 C.F.R. 571.216 at S7.1.)  The test device, a flat, unyielding rectangular platen, measuring 30" X 72", is lowered at specified orientation -- the longitudinal axis of the platen is at a 5 degree forward angle, and the lateral axis is at a 26 degree outboard angle, below the horizontal surface, and a 26 degree outboard angle, below the horizontal surface.  (Ibid. at S6; S7.2.)  The platen can be placed on either side of the front of the roof, but a particular vehicle need only be tested at one location.  The force is applied in a downward direction perpendicular to the lower surface of the platen at a rate of not more than 0.5 inches per second, until reaching a force of 1½ times the unloaded vehicle weight (or 5,000 pounds, whichever is less, for passenger cars only).  The test must be completed within 120 seconds.  No more than 5 inches of roof crush is permitted.  (Id. at S5; S7.5.)

14

Hernandez,  Irma
1377-002741

Like all FMVSSs, Standard 216 is a *minimum* performance test.  (*See* above at pp. 7 - 9). It has been criticized, as a method of evaluating roof strength in "real-world" rollovers, on several grounds, including:

1.   The 216 test is unrealistic.  Rollovers are not controlled load bearing events taking 2 minutes.

2.   The test allows the strength of the windshield to help support the roof.  During an actual rollover, the windshield often shatters, causing the roof to lose up to 30% of its strength.

3.   Rollovers are not static or quasi-static events.  They are dynamic events, involving directional changes in loading throughout the roll sequence.   The dynamic conditions of real crashes produce greater intrusion than is implied by the result of 216 testing.

4.   FMVSS 216 does not evaluate performance of the B & C pillars.

5.   FMVSS 216 does not consider how an occupant will be protected, since no anthropomorphic test dummy is used.

6.   FMVSS 216 does not apply to vehicles with a GVWR of more than 6,000 pounds, thus excluding several large SUVs from its requirements.

7.   The size and placement of the face angle of the test platen does not replicate the typical location and concentration of crash forces.

Henderson & Paine, officials of the Australian Government, wrote in their detailed 1995 study which recommending that their government not adopt FMVSS 216, that: "the FMVSS [216] test method used to assess strength is unrelated to the kind of strength that is required in rollovers .... Thus, the main conclusion of this review is that the FMVSS 216 is an inadequate

15

Hernandez,   Irma
1377-002742

standard....  ....  Apart from rather equivocal results from work by the NHTSA, all the statistical work on the effectiveness of FMVSS 216 has shown negative results. The most recent, biggest and best study . . . showed that roof strength as measured by the FMVSS test method in the GM vehicles studied is not significantly related either to the likelihood of severe injury or to severe roof damage in rollovers." (Henderson & Paine at pp. iii, 39.)

The history of NHTSA (or its predecessor agency in DOT) efforts to regulate roof intrusion starts more than 35 years ago, and the basic FMVSS 216 requirement was issued in December 1971. A final rule extending FMVSS 216 to light trucks was issued in 1991, and eventually took effect in September 1994 (essentially MY 1995).  Given the increasing percentage of the nation's fleet mix consisting of light trucks (particularly SUVs), with their higher center of gravity and greater propensity to rollover, there is more-or-less a consensus that FMVSS 216 needs to be upgraded.  The last three Administrators of NHTSA (Drs. Martinez, Bailey, and Runge) have indicated that FMVSS 216 needs to be upgraded.  For example, Shortly before leaving office, NHTSA Administrator Sue Bailey stated, "The Standard for roof crush should be more stringent particularly given that there are so many SUVs out there and they have a greater propensity to rollover."  NHTSA is now undertaking a rulemaking to upgrade FMVSS 216, including consideration of a dynamic test.  A more detailed rendition of NHTSA's rulemaking efforts follow below.

Hernandez, Irma
1377-002743